**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and PEOPLE OF THE STATE OF ILLINOIS, | |
| Plaintiffs, | |
| v. | |
| ACIA17 Automotive Inc., a Delaware corporation, d/b/a LEADER AUTOMOTIVE GROUP, | **Case No. 24-cv-13047** |
| ACIA ACQ Corp., a Delaware corporation, d/b/a LEADER AUTOMOTIVE GROUP, | |
| ACIA FINCO Corp., a Delaware Corporation, d/b/a LEADER AUTOMOTIVE GROUP, | **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |
| ACIA CH AUTO LLC, a Delaware Limited Liability Company, d/b/a NORTH CITY HONDA, and LEADER AUTOMOTIVE GROUP, | |
| ACIA CL LLC, a Delaware Limited Liability Company, d/b/a CRYSTAL LAKE CHRYSLER DODGE JEEP RAM, and LEADER AUTOMOTIVE GROUP, | |
| ACIA HN AUTO LLC, a Delaware Limited Liability Company, d/b/a HYUNDAI OF LINCOLNWOOD, and LEADER AUTOMOTIVE GROUP, | |
| ACIA KL AUTO LLC, a Delaware Limited Liability Company, d/b/a KIA OF LINCOLNWOOD, and LEADER AUTOMOTIVE GROUP, | |
| ACIA MOTORS LLC, a Delaware Limited Liability Company, d/b/a MERCEDES-BENZ OF BLOOMINGTON NORMAL, LINCOLN OF NORMAL, VOLKSWAGEN OF BLOOMINGTON NORMAL, VOLVO CARS NORMAL, AUDI BLOOMINGTON | |

1

NORMAL, SUBARU OF BLOOMINGTON
NORMAL, BLOOMINGTON NORMAL
AUTOMALL, and LEADER AUTOMOTIVE
GROUP,

ACIA P LLC, a Delaware Limited Liability
Company, d/b/a MERCEDES-BENZ OF
PEORIA, PORSCHE PEORIA,
VOLKSWAGEN OF PEORIA, AUDI
PEORIA, AUTOHAUS OF PEORIA, and
LEADER AUTOMOTIVE GROUP,

ACIA PG AUTO LLC, a Delaware Limited
Liability Company, d/b/a CHEVROLET OF
PALATINE, and LEADER AUTOMOTIVE
GROUP,

ACIA PH AUTO LLC, a Delaware Limited
Liability Company, d/b/a HYUNDAI OF
PALATINE, and LEADER AUTOMOTIVE
GROUP,

ACIA TC AUTO LLC, a Delaware Limited
Liability Company, d/b/a TOYOTA OF
LINCOLN PARK, and LEADER
AUTOMOTIVE GROUP,

ACIA TN AUTO LLC, a Delaware Limited
Liability Company, d/b/a TOYOTA OF
LINCOLNWOOD, and LEADER
AUTOMOTIVE GROUP,

AUTOCANADA INC., a Canadian
Corporation, and

JAMES DOUVAS, individually and as an
officer or director of ACIA17 AUTOMOTIVE
INC., ACIA ACQ CORP., ACIA FINCO
CORP., ACIA CH AUTO LLC, ACIA CL
LLC, ACIA HN AUTO LLC, ACIA KL
AUTO LLC, ACIA MOTORS LLC, ACIA P
LLC, ACIA PG AUTO LLC, ACIA PH AUTO
LLC, ACIA TC AUTO LLC, ACIA TN
AUTO LLC, d/b/a LEADER AUTOMOTIVE
GROUP,

Defendants.

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), and the People of the State of Illinois, by Kwame Raoul, Illinois Attorney General, for their Complaint allege:

1.      Plaintiffs bring this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and the FTC's Used Motor Vehicle Trade Regulation Rule ("Used Car Rule"), 16 C.F.R. Part 455. Defendants' violations relate to deceptive and unfair practices in advertising, marketing, promotion, offering for sale, lease, or financing, and sale, lease, or financing of vehicles. For these violations, Plaintiffs seek preliminary and permanent injunctive relief, monetary relief, civil penalties, and other relief for Defendants' acts or practices in violation of Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and the Used Car Rule.

2.      The People of the State of Illinois, as part of the same case or controversy, bring this action pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., ("Consumer Fraud Act"), the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq., the Illinois Prizes and Gifts Act, 815 ILCS 525/1 et seq., and the Illinois Motor Vehicle Advertising Regulations, ILL. ADMIN. CODE tit. 14, § 475.110 et seq., to obtain restitution, injunctive relief, and other equitable relief and penalties.

## SUMMARY OF CASE

3.      Doing business as Leader Automotive Group ("Leader Auto" or "Leader"), Defendants run a multi-location car dealership business in Illinois where, since at least April 2021, they have systematically defrauded, and continue to defraud, thousands of consumers seeking to purchase, lease, or finance vehicles.

4.     Defendants' illegal practices take a variety of forms. First, Defendants attract customers to their dealerships using illegal prize mailers as well as through textbook bait-and-switch tactics, advertising cars online at enticingly low prices and then adding hundreds to thousands of dollars more once consumers are onsite, including charging for additional, undisclosed junk fees. Second, Defendants deceive consumers into paying hundreds to thousands of dollars for optional accessories, also known as "add-ons," either by falsely claiming that they are required or by sneaking them into transactions without consumers' knowledge or consent. To hide their illegal conduct from consumers and law enforcement, Defendants induce their employees to post fake, positive online reviews, either by threatening to withhold compensation or by paying as much as $25 per review. These fake positive reviews artificially bolster Defendants' overall customer rating as well as conceal truthful negative reviews left by actual Leader Auto customers. Defendants further manipulate their online reviews by pressuring, bullying, and coercing consumers into posting reviews that do not represent their actual experiences, views, or opinions.

5.     From April 2021 until at least September 2023, Defendant James Douvas, Leader's former Vice President of U.S. Operations, oversaw virtually every aspect of Defendants' U.S. business. During that time, he implemented a series of illegal practices across all ten of their locations that exploited the post-pandemic shortage of available automobiles and took advantage of consumers in desperate need of affordable transportation. These practices align with a motivational slogan that Douvas often repeated to his staff: "Buyers are Liars. I don't give a f*** what they tell you, take their money."

6.     Douvas created a culture that prioritized squeezing as much money as possible from customers – a culture that persists to this day. These practices caused and continue to cause extensive harm to consumers. Thousands of consumers, many struggling financially, have lost— and continue to lose—tens of millions of dollars because of Defendants' ongoing conduct.

## JURISDICTION AND VENUE

7.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345. Subject matter jurisdiction is conferred upon this Court with respect to the supplemental state law claims of the State of Illinois by 28 U.S.C. § 1367.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

9.     The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Used Car Rule, 16 CFR § 455, which prohibits unfair or deceptive advertising and business practices by used car dealers.

10.     The Attorney General of the State of Illinois, Kwame Raoul, is charged with the enforcement of the Consumer Fraud Act and the Illinois Motor Vehicle Advertising Regulations promulgated thereunder (815 ILCS 505/7, 815 ILCS 505/4), and the Illinois Prizes and Gifts Act, 815 ILCS 525/40(c).

11.     The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this lawsuit pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7(a).

## DEFENDANTS

### Corporate Defendants

12.     Defendant ACIA17 Automotive Inc. ("ACIA17 Automotive"), doing business as Leader Automotive Group, is a Delaware corporation with its principal place of business at 1561 N. Fremont Street, Chicago, Illinois. ACIA17 Automotive is the sole owner of Defendant ACIA ACQ Corp. ACIA17 Automotive transacts or has transacted business in this District and throughout the United States.

13.     Defendant ACIA ACQ Corp. ("ACIA ACQ"), doing business as Leader Automotive Group, is a Delaware corporation with its principal place of business at 1561 N. Fremont Street, Chicago, Illinois. ACIA ACQ is the sole owner of Defendants ACIA CH Auto LLC, ACIA CL LLC, ACIA HN Auto LLC, ACIA KL Auto LLC, ACIA Motors LLC, ACIA P LLC, ACIA PG Auto LLC, ACIA PH Auto LLC, ACIA TC Auto LLC, and ACIA TN Auto LLC. Through these subsidiaries, ACIA ACQ operates ten automobile dealerships in the Chicago area and downstate Illinois. ACIA ACQ transacts or has transacted business in this District and throughout the United States.

14.     Defendant ACIA FINCO Corp. ("ACIA FINCO") is a Delaware corporation with its principal place of business at 200, 15511-123 Avenue NW, Edmonton, ABC T5V 0C3 Canada. ACIA FINCO is a financing entity through which money flows from the dealership corporations to ACIA17 Automotive, Inc. ACIA FINCO transacts or has transacted business in this District and throughout the United States.

15.     Defendant ACIA CH Auto LLC ("ACIA CH"), doing business as North City Honda and Leader Automotive Group, is a Delaware corporation with its principal place of business at 6600 N. Western Avenue, Chicago, Illinois. ACIA CH transacts or has transacted business in this District and throughout the United States.

16.     Defendant ACIA CL LLC ("ACIA CL"), doing business as Crystal Lake Chrysler Dodge Jeep Ram and Leader Automotive Group, is a Delaware corporation with its principal place of business at 5404 S. Illinois Route 31, Crystal Lake, Illinois. ACIA CL transacts or has transacted business in this District and throughout the United States.

17.     Defendant ACIA HN Auto LLC ("ACIA HN"), doing business as Hyundai of Lincolnwood and Leader Automotive Group, is a Delaware corporation with its principal place of business at 6747 Lincoln Avenue, Lincolnwood, Illinois. ACIA HN transacts or has transacted business in this District and throughout the United States.

18.     Defendant ACIA KL Auto LLC ("ACIA KL"), doing business as Kia of Lincolnwood and Leader Automotive Group, is a Delaware corporation with its principal place of business at 6750 Lincoln Avenue, Lincolnwood, Illinois. ACIA KL transacts or has transacted business in this District and throughout the United States.

19.     Defendant ACIA Motors LLC ("ACIA Motors"), doing business as Mercedes-Benz of Bloomington Normal, Lincoln of Normal, Volkswagen of Bloomington Normal, Volvo Cars Normal, Audi Bloomington Normal, Subaru of Bloomington Normal, Bloomington Normal Auto Mall, and Leader Automotive Group, is a Delaware corporation with its principal place of business at 1430 Fort Jesse Road, Normal, Illinois. ACIA Motors transacts or has transacted business in this District and throughout the United States.

20.     Defendant ACIA P LLC ("ACIA P"), doing business as Mercedes-Benz of Peoria, Porsche Peoria, Volkswagen of Peoria, Audi Peoria, Autohaus Motors, and Leader Automotive Group, is a Delaware corporation with its principal place of business at 2322 W. Van Winkle Way, Peoria, Illinois. ACIA P transacts or has transacted business in this District and throughout the United States.

21.     Defendant ACIA PG Auto LLC ("ACIA PG"), doing business as Chevrolet of Palatine and Leader Automotive Group, is a Delaware corporation with its principal place of business at 151 E. Lake Cook Road, Palatine, Illinois. ACIA PG transacts or has transacted business in this District and throughout the United States.

22.     Defendant ACIA PH Auto LLC ("ACIA PH"), doing business as Hyundai of Palatine and Leader Automotive Group, is a Delaware corporation with its principal place of business at 221 E. Lake Cook Road, Palatine, Illinois. ACIA PH transacts or has transacted business in this District and throughout the United States.

23.     Defendant ACIA TC Auto LLC ("ACIA TC"), doing business as Toyota of Lincoln Park and Leader Automotive Group, is a Delaware corporation with its principal place of business at 1561 N. Fremont Street, Chicago, Illinois. ACIA TC transacts or has transacted business in this District and throughout the United States.

24.     Defendant ACIA TN Auto LLC ("ACIA TN"), doing business as Toyota of Lincolnwood and Leader Automotive Group, is a Delaware corporation with its principal place of business at 7725 N. Cicero Avenue, Lincolnwood, Illinois. ACIA TN transacts or has transacted business in this District and throughout the United States.

25.     Defendant AutoCanada Inc. is a Canadian corporation with its principal place of business at 200-15511 123 Avenue NW in Edmonton, Alberta. AutoCanada is the sole owner of

Defendant ACIA17 Automotive. AutoCanada transacts or has transacted business in this District and throughout the United States.

**Individual Defendant**

26.     From March 2021 until September 2023, Defendant James Douvas was the Vice President of U.S. Operations of Defendant AutoCanada, as well as a director and officer of Defendants ACIA ACQ and ACIA17 Automotive. Throughout that period, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. For example, Douvas managed all ten of Leader Auto's dealerships (which collectively operate eighteen franchises). Upon assuming his position, Douvas brought in dozens of new staff and summarily fired multiple existing employees. He visited each dealership location regularly and often personally approved individual deals; he led regular meetings with finance managers, sales managers, and general managers from all dealership locations at which he set and enforced policies regarding the sale and financing of vehicles and add-on-products, as well as instructed staff on how to evade law enforcement scrutiny; he often confiscated attendees' cell phones to prevent these meetings from being recorded; he directed staff to deceptively claim that Defendants pre-install certain add-on products to every vehicle and that consumers therefore must pay for such add-ons in order to purchase, finance, or lease a car from Leader Auto; he responded to and supervised the response to consumer complaints; he engaged with Plaintiff Illinois Office of the Attorney General and the Better Business Bureau regarding regulatory and compliance issues; he was aware of, and approved of, Defendants' practice of charging junk certification and reconditioning fees; and he directed employees to: (a) post fake positive consumer reviews online, (b) set deceptively low advertised prices for vehicles as a part of Leader Auto's bait-and-switch scheme, (c) falsely tell

consumers that add-ons are mandatory, and (d) destroy or conceal evidence of Defendants'
misconduct. Finally, Douvas received updates regarding law enforcement actions taken by
Plaintiffs as well as other regulatory agencies against automobile dealerships. A year into
Plaintiffs' investigation, Leader Auto terminated Douvas for cause. He subsequently held a
position as an executive with another multi-location dealership group. Douvas resides in this
District and, in connection with the matters alleged herein, transacted business in this District.

## **COMMON ENTERPRISE**

27.     Defendants ACIA17, ACIA ACQ, ACIA FINCO, ACIA CH, ACIA CL, ACIA
HN, ACIA KL, ACIA Motors, ACIA P, ACIA PG, ACIA PH, ACIA TC, ACIA TN, and
AutoCanada (collectively, "Corporate Defendants") have operated as a common enterprise while
engaging in the deceptive and unfair acts and practices alleged below. The Corporate Defendants
have conducted the business practices described below through an interrelated network of
companies that have common ownership, officers, managers, employees, and business functions,
and that have commingled funds. Because they have operated as a common enterprise, each of
them is liable for the acts and practices alleged below.

## **COMMERCE**

28.      At all times relevant to this Complaint, Defendants have maintained a substantial
course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,
15 U.S.C. § 44.

29.     Subsection 1(f) of the Illinois Consumer Fraud Act defines "trade" and
"commerce" as follows:

> The term 'trade' and 'commerce' mean the advertising, offering for sale, sale or
> distribution of any service and any property, tangible or intangible, real, personal,
> or mixed, and any other article, commodity, or thing of value wherever situated,

and shall include any trade or commerce directly or indirectly affecting the people of this State.

815 ILCS 505/1(f).

30.     Defendants were at all times relevant to this Complaint engaged in trade and commerce in the State of Illinois by advertising, offering for sale, and selling new and used vehicles in and from the State of Illinois.

### DEFENDANTS' BUSINESS ACTIVITIES

*Overview*

31.     AutoCanada expanded its operations into the United States by purchasing a group of Illinois dealerships in 2018. These dealerships struggled to be profitable. Beginning in 2021, AutoCanada installed James Douvas as the Vice President of U.S. operations to embark on personnel changes and new business tactics, including an "aggressive used-vehicle strategy." Defendants quickly saw results. In 2022, AutoCanada reported record-setting first quarter revenue and lauded its U.S. operations a "key driver." Defendants acquired additional dealerships in Illinois and are now the owners and operators of ten automobile dealerships located throughout the Chicago area and central Illinois that collectively do business as Leader Automotive Group. In 2022, Leader Auto reported gross revenue of $910.9 million on the sale of over 16,000 vehicles.

32.     As detailed below, Leader Auto's considerable financial success is built on a series of unfair and deceptive practices. Defendants start by baiting consumers with advertisements promising below-market prices for new and used vehicles, only to inflate these prices with junk fees and add-on charges when consumers arrive at dealerships, often after having traveled hours from their homes specifically to obtain the deceptively low advertised price. Defendants frequently claim that many of these fees and add-on charges are mandatory,

11

despite not being part of the advertised price. They also falsely claim that certain add-ons have already been installed on or applied to the vehicles so that consumers have no choice but to purchase them. In reality, Defendants often do not apply or install these products at all.

33.     Defendants then use the financing and insurance process as an additional opportunity to defraud their customers. In many instances, Defendants either deceive consumers into purchasing expensive add-ons or insert add-on charges into financing paperwork without consumers' knowledge or consent.

34.     In addition, Defendants engage in a variety of other illegal practices, including: (1) the deceptive advertising and sale of certified pre-owned vehicles; (2) the deceptive sale in the U.S. of used vehicles manufactured for the Canadian market; (3) the failure to comply with the FTC's Used Car Rule by failing to disclose or provide consumers with required Buyers Guides; and (4) conduct that violates Illinois law, including (a) advertising vehicles for sale which it has already sold, (b) failing to include required disclosures in prize mailers, (c) advertising finance offers without disclosing all the terms of the offer, (d) failing to include all costs to the consumer in advertised prices, (e) selling vehicles for more than the advertised price, and (f) failing to make vehicles available for purchase at the advertised price.

35.     To conceal evidence of their illegal practices, Defendants:

- Inundate Leader's online Google listings with fake positive reviews that employees are either required or paid to write;

- Maintain and enforce a company-wide policy that requires employees to destroy documents showing the junk fees charged to their customers;

- Utilize a questionable accounting practice known as "top lining," in which the costs of certain add-ons and junk fees are absorbed into the sale price of a vehicle to hide these costs from lenders; and

- Retaliate against Leader Auto employees who either refuse to engage in illegal practices or raise concerns about these practices.

36.     Defendants' illegal practices are so egregious and pervasive that several vehicle manufacturers have initiated the process of terminating their franchise agreements with Leader, while other manufacturers have required Defendants to implement performance improvement plans.

*Background Regarding Add-Ons*

37.     Add-on charges play an integral role in Defendants' bait-and-switch tactics. Leader generally classifies such charges as either "frontend" or "backend." Frontend add-ons are typically offered on the salesfloor at the time consumers negotiate the purchase of a vehicle. Defendants primarily sell two frontend add-ons: (1) a protective exterior and interior sealant known as Xzilon, usually priced at $2,595 but sometimes as high as $5,995; and (2) a GPS security tracking device known as LoJack, usually priced between $1,595 and $2,595. Defendants began selling Xzilon in or around May 2021, and they began selling LoJack in or around November 2022. Not until the late stages of Plaintiffs' investigations, sometime in mid-2024, did Defendants claim that they stopped selling Xzilon.

38.     Backend add-ons, by contrast, are typically offered out of the dealership's finance and insurance ("F&I") office. These products include guaranteed asset protection, commonly known as GAP or GAP coverage; vehicle service contracts; maintenance contracts; and "road

13

hazard" or "appearance protection" packages that purportedly cover damage to tires, wheels, and paint. On average, Defendants sell individual backend add-ons for several thousand dollars each.

39.     In numerous instances, Defendants falsely claim that consumers must buy add-ons in order to purchase, lease, or finance a vehicle. For example, Defendants regularly tell consumers they must purchase frontend add-ons, such as Xzilon and LoJack, because both have already been installed on the vehicle. In many other instances, Defendants have charged customers for add-ons that they never agreed to purchase. These practices substantially increase the cost of purchasing and financing vehicles, often by thousands of dollars.

40.     Add-ons also substantially increase Defendants' revenue and gross margins. For the third quarter of 2023, Leader reported a 99.2% gross profit percentage on the sale of its add-ons. Gross profits on Defendants' sale of add-ons increased substantially once Defendant Douvas assumed his position in March 2021. For that quarter, Leader reported gross profits per vehicle on the sale of add-ons of $2,145. By the fourth quarter of 2021, however, after Douvas began requiring the sale of Xzilon on all new and used vehicles, this figure had increased to $3,387; in 2022, it exceeded $4,000 per vehicle.

41.     Defendant AutoCanada, its staff, executives, and outside auditor knew about Leader's add-on sales practices, including Xzilon and LoJack, and routinely discussed add-ons with Leader staff.

42.     To enforce Douvas's Xzilon policy, Defendants tie employee compensation to the sale of the frontend add-ons. Salespeople often earn considerably more from the sale of Xzilon than they do in commissions from the sale of the automobile itself.

43.    According to a survey of Defendants' customers, at least 78% of them were charged for at least one add-on without authorization or because Defendants claimed they were required. At many dealerships, this figure exceeded 80%.

44.    Defendants have charged thousands of consumers millions of dollars for such unauthorized, unwanted add-ons. For Xzilon alone, between May 2021 and January 2023, Defendants sold at least 18,863 Xzilon add-ons at an average price of $2,388. During that period, Leader's total gross revenue from Xzilon sales alone was $44,110,994.

45.    Defendant Douvas closely monitored the total percentage of deals that included a Xzilon sale, an industry metric known as "penetration rate." Douvas shamed and punished managers of locations whose Xzilon penetration rate fell below 70% while praising those with rates above this threshold. Months *after* being notified of Plaintiffs' investigation, Defendants did not halt the deceptive conduct related to Xzilon, but instead perpetuated it by negotiating a new deal for Xzilon. This deal contemplated that Defendants would continue pre-loading Xzilon to all new and used cars, requiring customers to purchase it, and selling it at the same price.

46.    Defendants' add-on charges often represent 20% or more of a vehicle's base purchase price. A few examples that occurred *after* Defendants received notice of Plaintiffs' investigation include:

- The February 2023 sale of a 2016 Hyundai Elantra with over 100,000 miles sold by Hyundai of Lincolnwood for $9,625 with an additional charge of $2,599 for Xzilon, equivalent to 27% of the vehicle sales price. The buyer also was charged an extra $2,000 for a road hazard contract. As a result, this consumer paid a total of $4,599 for add-ons, equivalent to 47% of the sales price;

- The June 2023 sale of a 2015 Chevrolet Equinox with over 70,000 miles sold by Bloomington-Normal Automall for $13,488 with an additional charge of $2,595 for Xzilon, equivalent to 19% of the vehicle sales price. The buyer also was charged an extra $2,788 for a vehicle service contract. As a result, this consumer paid a total of $5,383 for add-ons, equivalent to 39% of the sales price;

- The May 2023 sale of a 2014 Kia Sorento with 68,000 miles sold by North City Honda for $12,895 with an additional charge of $2,595 for Xzilon, equivalent to 20% of the vehicle sales price. The buyer also was charged an extra $4,471 for a vehicle service contract. As a result, this consumer paid a total of $7,066 for add-ons, equivalent to 54% of the sales price; and

- The June 2023 sale of a 2013 Nissan Juke with 68,000 miles sold by Toyota of Lincolnwood for $10,995 with an additional charge of $2,595 for Xzilon, equivalent to 23% of the vehicle sales price. The buyer also was charged an extra $3,348 for GAP and a vehicle service contract. As a result, this consumer paid a total of $5,943 for add-ons, equivalent to 54% of the sales price.

**Defendants' Deceptive Bait-and-Switch Practices**

47. Using a variety of ruses, Defendants lure consumers into dealerships under the false pretense that they will be able to purchase cars for misleadingly low advertised prices that are set hundreds to thousands of dollars below their fair market value. According to Douvas, "We price them low to get [customers] thru the door."

48. Defendants disseminate or cause to be disseminated advertisements that promote the purchase, finance, or lease of vehicles in television, radio, electronic mail, direct mail, online ads, and social media platforms such as Facebook.

49. Advertisements for specific vehicles typically indicate, among other things, the make, model, and year of the vehicle, the vehicle identification number ("VIN"), stock number, its trim level and options, and the sales price.

50. In their advertisements, Defendants falsely claim to offer "transparent pricing" as well as the ability to purchase vehicles with "no surprise add-ons." Defendants further represent that consumers can purchase particular new and used vehicles at specific prices. Despite such assurances, Defendants charge consumers hundreds to thousands of dollars more than the advertised prices for surprise "market adjustment" and add-on charges, as well as junk fees.

51. In numerous other instances, Defendants advertise cars that have either already been sold or are otherwise not available, yet another gimmick used to draw consumers into dealerships under false pretenses and then steer them to more expensive options that include undisclosed add-on charges and junk fees.

52. As a result of these practices, consumers typically do not learn a vehicle's true cost until they have traveled to a dealership (often from hundreds of miles away), test driven a vehicle or vehicles, engaged in protracted negotiations, applied for financing, and waited periods of time that frequently last hours for no apparent reason. Douvas explained to his staff that Defendants could add junk fees at the dealership to the low price advertised online because, once consumers get to the store, "they're not leaving" without buying a car.

### *Misrepresentations Regarding "Market Adjustments" and New Car Prices*

53. Defendants' advertisements display specific new cars available for sale or lease, listing either the Manufacturer Suggested Retail Price ("MSRP"), a purportedly lower "Leader Price," or the MSRP with a strikethrough next to the instruction "call for pricing."

54.     Based on these ads, many consumers believe that Defendants will sell or lease them a vehicle for the advertised price. But Defendants misrepresent the price of their vehicles. In numerous instances, Defendants charge consumers hundreds or thousands of dollars more than the advertised price, including for a previously undisclosed and contrived "market adjustment."

### *Misrepresentations Regarding Add-on Charges*

55.     Defendants' ads also frequently omit thousands of dollars in frontend add-on charges. For example, in the advertisement reproduced in part below, Defendants represent that consumers can purchase a 2019 Kia Forte S for $17,087.



**Image A: Cars.com Ad (February 2023)**

The ad appeared on Cars.com, which incorporates a "Deal Gauge" pricing tool (*see* **Image B**, below) into many of its listings to inform consumers whether a particular car is a "Great Deal," "Good Deal," or "Fair Deal."



**Image B: Cars.com Deal Gauge**

56.     Defendants often deceptively manipulate pricing tools like these, causing them to display a lower price than the actual selling price of a vehicle by failing to include hundreds to thousands of dollars in undisclosed add-on charges and junk fees. As a result, these pricing tools inaccurately rate vehicles as better or more favorable deals based on the deceptively low price. Consumers rely on these pricing tools in deciding whether to visit a dealership and purchase a vehicle.

57.     As another example of this practice, Cars.com classified the 2019 Kia Forte as a "Great Deal" using Defendant's advertised price of $17,087. However, this price did not account for over $4,000 in frontend add-on charges that would be pushed on any consumer seeking to purchase the vehicle, equivalent to more than 20% of the advertised price. These extra charges consisted of $2,595 for Xzilon and $1,595 for LoJack. Thus, a consumer could only purchase this vehicle by paying substantially more than the advertised price—as much as $4,190 more, given the combined Xzilon and LoJack charges. In fact, Defendants charged $3,190 for these products to the consumer who ultimately purchased this vehicle, which, according to the pricing tool, raised the total cost well above the car's average market price.

58.     Based on these ads, consumers often believe that they will be able to purchase the vehicle for the advertised price without any add-ons or additional fees. Defendants reinforce this belief by generally refusing to discuss pricing details with consumers unless they are physically present at one of Leader's dealerships. If consumers call to inquire about the advertised price, sales representatives must follow scripts that generally do not allow the disclosure or confirmation of specific price information while assuring consumers that they will be rewarded for visiting a dealership. For example, consumers who ask to speak with a manager by phone about pricing are informed, per Defendants' script, that "all managers are currently tied up" and are encouraged to schedule a "VIP appointment" at a dealership where they are assured that they will find that Leader prices its "vehicles competitively based on a 500-mile radius." Consumers who "push" for a price are asked what they can afford per month, promised that Leader has a "tremendous selection [and] availability of vehicles" in that price range, and prompted: "How soon can you come into our dealership and maximize your savings?" Those who insist on negotiating or receiving detailed pricing information over the telephone are frequently informed that "your presence is your leverage."

59.     In numerous instances, when consumers attempt to purchase specific vehicles for the prices advertised, Leader Auto charges them hundreds to thousands of dollars more for required frontend add-ons, resulting in consumers paying substantially more than the advertised prices or negating any later discounts that they manage to negotiate.

60.     Scores of consumers have been harmed by these bait-and-switch practices across all of Defendants' ten locations. For example, in August 2022, a consumer found a used car listed online at one of Defendants' Chicago-area dealerships. Based on the car's low advertised price, the consumer visited the dealership for a test drive where she learned, for the first time,

that the car could not be purchased for the advertised price and that she would have to pay an additional $2,595 for Xzilon, which the salesperson said had been pre-applied to the dealership's vehicles. The consumer tried to both reject and negotiate the price of Xzilon with multiple employees, only to be told that she could not purchase the car without also paying $2,595 for this add-on. Because the consumer urgently needed a car, she reluctantly agreed to the additional $2,595 charge.

61.     Defendants' bait-and-switch pricing scheme has continued even after Defendants learned of Plaintiffs' investigation. In or around September 2023, ten months after receiving the Commission's civil investigative demand and 17 months after receiving the Attorney General's investigative subpoena, a consumer attempted to purchase a used car advertised on Leader's website for $41,995. The ad included a detailed description of the car's features as well as a pricing tool declaring it to be a "Good Deal" at that price. When the consumer visited Leader's dealership to test drive the vehicle, however, a salesperson presented her with a written offer consisting of the advertised price plus $2,595 for Xzilon and $1,595 for LoJack. When the consumer objected to paying for optional charges that would increase the car's advertised price by over $4,000, the salesperson informed her that vehicle prices on Defendants' website were not accurate because they did not include the cost of frontend add-ons that consumers are required to purchase. Eventually, the consumer spoke with two managers, one of whom insisted that she would be required to pay for these add-ons if she wanted to buy the vehicle. The other manager claimed that Defendants' "legal department" had advised him that these required charges did not need to be disclosed as part of the advertised price on the dealership's website.

*Misrepresentations Regarding Junk Fees and Used Vehicles*

62.    In addition to deceptively charging for frontend add-ons, as a part of their bait-and-switch scheme, Defendants also frequently require consumers to pay hidden junk fees. Specifically, Defendants advertise used and certified pre-owned (sometimes called "CPO") vehicles for low prices to attract consumers into dealerships. Defendants then add hundreds to thousands of dollars in previously undisclosed fees, purportedly to cover vehicle certification, reconditioning, and inspection costs.

63.    When properly certified, CPO vehicles are covered by a limited manufacturer warranty. This warranty is not activated unless a dealer complies with each step of the manufacturer's required certification process. Before they can advertise a vehicle as certified, manufacturers generally require dealers to complete a multi-point inspection of the vehicle and to perform any needed reconditioning or repairs as well as pay a fee to the manufacturer, typically between $400 to $500. To certify a used Hyundai, for example, Defendants must follow a four-step process: 1) conduct a 173-point inspection in accordance with Hyundai's checklist; 2) complete all necessary reconditioning and repairs; 3) pay either a $469 or $499 fee to Hyundai; and 4) report the sale of the vehicle within 48 hours of its delivery to the buyer.

64.    In numerous instances, when consumers attempt to purchase certified vehicles for the prices advertised, Defendants charge hundreds to thousands of dollars in additional fees for services that are purportedly associated with certifying the vehicle (e.g., fees identified as "CPO" or "certification"). In most instances, Defendants roll these costs into the price of the vehicle that appears in the closing documents. Moreover, Defendants often misrepresent that consumers are required to pay these additional certification fees to purchase vehicles. In addition to being

deceptive, these practices violate manufacturer guidelines regarding certification, which require that any certification costs passed on to the customer be included in the advertised price.

65.     An April 2022 email to Defendant Douvas summarized the scope of this practice, identifying the junk certification fees charged at each of Leader's ten locations. These fees ranged from as little as $400 per vehicle at one dealership, to as high as $2,995 at other locations. Four dealerships, the email noted, charged "as much as they can." One of these dealerships indicated, however, that "if the customer looks like they are from the [Attorney General's office]" there would be "no fee" for vehicle certification.

66.     Worse yet, despite charging these certification fees, Defendants often fail to follow the steps required to actually obtain manufacturer certification. In numerous instances, Defendants have advertised a vehicle as certified, but failed to report the sale of that vehicle to the manufacturer or to pay the certification fee. As a result, consumers did not receive a certified vehicle or the benefits of the limited manufacturer warranty that come with certification. At least one manufacturer repeatedly notified Defendants of their violations of its CPO policies.

67.     Defendants also frequently charge consumers who purchase used vehicles junk fees that purportedly cover the costs of preparing used vehicles for sale. These "reconditioning" or "inspection" fees frequently add hundreds to thousands of dollars to the advertised price of cars, are not disclosed in Defendants' ads, and typically bear no relationship to any work performed by Defendants. As one former sales manager put it: "The reconditioning fees that they penciled at the desk, those were fake fees…that was just [Leader's executive manager] trying to find a way to make more money on the car." These junk reconditioning fees often represent a substantial percentage of a car's total cost -- for example, Defendants added a $2,999 "inspection" fee to the price of a $15,000 used car sold to one of their own employees.

### *Misrepresentations Regarding Vehicle Availability*

68.     Another bait-and-switch tactic employed by Defendants to draw customers into dealerships involves advertising vehicles that are no longer available. Consumers frequently find a car advertised online, confirm its availability with Defendants, and show up at the dealership only to be informed that it has "just been sold" or is otherwise not available. Defendants then pressure such consumers to consider less desirable, more expensive options.

69.     For example, before leaving her home in Indiana, one consumer called Defendants' Toyota of Lincoln Park dealership to confirm the availability of a particular truck, and then called twice again in the course of her three-hour drive to the dealership. Each time, Leader sales representatives assured her that this exact vehicle would be available and ready for her appointment. Instead, upon arrival, a salesperson informed her that the truck had just been sold. While driving the three hours back home, the consumer again called Defendants, spoke with a salesperson, and was told that the same truck was available for purchase and that she should come to the dealership to see it.

70.     Defendants advertised vehicles on their website for several days after the vehicle had sold, in some instances for days or months after the sale of the vehicle.

71.     In one instance, for example, Defendants continued advertising a 2021 Kia Soul GT-Line Hatchback with stock number KLM7764542 on their website for almost 4 months after its sale date of December 14, 2021. As of March 28, 2022, an image on the website advertising the vehicle indicated that "This is going to sell soon. 159 people have recently viewed it."



**Image C: Kia of Lincolnwood Website visited March 28, 2022**

***Defendants Falsely Claim that Add-ons are Mandatory***

72.     Defendants unlawfully extract thousands of dollars from consumers by claiming that they must accept certain frontend add-on charges to purchase a car. Defendants falsely claim that the add-ons are required, typically either because of company policy or because Leader pre-installs these products on all new and used cars. Some customers are falsely told that the add-ons are required to qualify for financing. All of these claims are false -- the add-ons are optional, they are often not pre-installed, and they are not required to obtain financing.

73.     In an email to his top managers, Defendant Douvas succinctly outlined Defendants' policy of requiring the purchase of frontend add-ons: "If [consumers] don't want [Xzilon and LoJack], they don't have to buy the car." In another email to a different group of managers, Douvas stated: "You have to tell the customer that Xzilon and lojack [sic] is not optional." Multiple former employees confirm that they were required to pitch Xzilon and LoJack as mandatory purchases.

74.     Consumers who question Defendants' charges for Xzilon or LoJack are typically informed that these are required purchases because they've already been installed on the car. In

one instance, a salesperson even suggested that it would be illegal for Defendants to install Xzilon and LoJack on some vehicles, but not others: "If you install [an add-on] on one car, you have to install it on all cars. It's the law. It's fair customer treatment." In another instance, when a caller objected to paying for Xzilon and LoJack, the general sales manager at Defendants' Honda dealership responded: "This is a used car; I can install anything on it that I like."

75.     When questioned about the frontend add-on charges over the telephone, Leader employees often suggest that the charges may be open to negotiation, but only if the consumer comes to the dealership in person.

76.     When negotiating with consumers over the price of a vehicle at a dealership, Defendants often use Xzilon and LoJack as leverage to offset any price concessions that they otherwise might make. Even then, before discounting the Xzilon cost, Defendants require consumers to endure multiple rounds of high-pressure negotiations with a seemingly endless parade of managers.

77.     As a result of these practices, consumers often pay hundreds to thousands of dollars for unwanted frontend add-ons. For example, a consumer who attempted to purchase a minivan from one of Defendants' Chicago-area dealerships without also paying $1,595 for "interior" Xzilon and $1,595 for LoJack was told by multiple employees that she could not buy the minivan without these add-ons because they had already been installed on the vehicle. After hours of arduous negotiations, Defendants finally agreed to charge her for only one of the two frontend add-ons, which still added $1,595 to the advertised price of the vehicle. In another instance, nearly a year after Defendants became aware of the FTC's investigation, a different salesperson at the same dealership required an older consumer to pay $2,595 for LoJack to purchase an $18,000 used vehicle.

### *Add-ons Are Optional*

78.     Defendants regularly represent to consumers that add-ons are mandatory.

However, when responding to inquiries from regulators, the Better Business Bureau, and other

third parties, Defendants often acknowledge that add-ons are optional. For example, Defendant

Douvas himself responded as follows to Plaintiff Illinois Office of the Attorney General when

provided with a complaint about a mandatory Xzilon charge: "With regard to exterior and

interior protective packages, as with any extended warranty or other after-market product offered

by our dealerships, the protection packages are optional."

79.     To evade law enforcement scrutiny, Defendant Douvas instructed his staff not to

state in writing that add-ons are mandatory. For example, when a consumer inquired in January

2023 about whether a car could be purchased from one of Leader's dealerships without Xzilon or

LoJack, Defendant Douvas provided the following instruction to his managers: "Could be

undercover [Attorney General]. Tread carefully. Maybe verbal only."

### *Defendants Falsely Claim to Install Add-ons*

80.     In many instances, Defendants fail to apply or install add-ons. As a result, many

consumers pay hundreds to thousands of dollars for add-ons they never receive. Defendants have

ignored complaints from employees and consumers about this practice. In one instance, instead

of ensuring that customers who paid for Xzilon actually received cars treated with the product,

the general manager of a dealership merely began providing customers with a home touch-up kit

consisting of Xzilon spray bottles.

81.     Customers have complained to Defendants after paying for Xzilon and later

discovering that nothing has been applied to their vehicle. For example, Defendants required one

customer to pay $2,595 for Xzilon, purportedly because it had been pre-applied to the used car

that he purchased. The customer objected to the additional charge, stating that he did not want or need a paint sealant, but the salesperson refused to negotiate the price. The customer happened to be a professional detailer, however, and when he brought the car to his detail shop, he discovered that it had not been treated with Xzilon at all. The customer thereafter complained to Defendants, but an individual who identified himself as a vice president of Leader Auto refused to provide even a partial refund.

82.     Other consumers have made similar discoveries. For example, one consumer required to pay $2,595 for pre-applied Xzilon learned before leaving the dealership that it had never been applied. Another consumer who spent hours at a Leader dealership insisting that she should not be required to purchase supposedly pre-installed LoJack, reluctantly paid $1,595 for the device but then could not activate it after leaving the dealership. She contacted Defendants' finance manager to complain, but he denied that she had purchased LoJack, even though she had signed a LoJack contract in his office. Yet another consumer required to pay $2,595 for LoJack subsequently learned from a different dealership repairing her vehicle that the device had never been installed.

### *Defendants Charge Consumers for Add-ons without Their Consent*

83.     In numerous instances, Defendants have charged consumers for add-ons in connection with a vehicle purchase without obtaining consumers' express, informed consent. This practice, commonly known as "payment packing," can increase the purchase price of a vehicle by thousands of dollars. Payment packing occurs regularly at many Leader Auto dealerships and results in unauthorized add-on charges that are difficult to detect, both because they are typically spread out over monthly financing payments and because of the elaborate steps that Defendants take to conceal them.

84.     During the closing process, which takes place in the dealership's F&I office, Defendants often prevent customers from reviewing documents showing the add-on charges have been packed into their deal. In many instances, finance managers require customers to digitally sign a series of dense, lengthy documents, either on a tablet device or by using a stylus and track pad attached to a computer facing away from the consumer. A former employee recalls hearing Douvas and managerial-level employees refer to the tablets as "murder machines" because customers are encouraged to click quickly through forms without the opportunity to read what they are signing.

85.     In other instances, customers sign hard copy documents to finalize their purchase, but finance managers physically block them from viewing what they are signing with another document. Customers who ask questions or attempt to review the documents more closely are typically rushed through the process and assured that the documents are standard forms applicable to every car purchase that will be provided at the end of the process. Defendants then often fail to provide customers with complete sets of their deal paperwork or do not provide any documents at all.

86.     The experience of one customer who traveled from out of state to purchase a new Toyota exemplifies this conduct. During the closing process, Leader's finance manager instructed the consumer to electronically sign a series of documents displayed on a computer screen turned away from her by using a tracking pad. When the customer asked for an explanation of the documents, the finance manager falsely claimed that they consisted of standard paperwork common to all car sales. The finance manager then physically prevented her from viewing a hard copy of the purchase agreement while she signed by partially covering the agreement with another document and simultaneously handing her a second document to distract

her. When the consumer returned home with the vehicle, she discovered $8,000 in unauthorized add-on charges.

87.     Such practices have continued long after Defendants received notice of Plaintiffs' investigation. In August 2023, for example, eight months after being served with the Commission's civil investigative demand, Defendants rushed a customer through the process of signing closing documents but did not provide him a copy of these documents. Two weeks later, after the documents arrived in the mail, the customer discovered that Defendants had packed over $3,000 in unauthorized add-on charges.

88.     In still other instances, Defendants charge customers for add-ons that they told the customers would be free. For example, while negotiating the purchase of a vehicle at one of Defendants' Toyota dealerships, employees promised a customer that she would receive Xzilon, LoJack, and a service contract included in the purchase price of the car. After being rushed through the signing process and returning home, however, the customer discovered that she had paid nearly $10,000 for the same add-ons she had been assured would be free. The consumer then spent weeks emailing and calling Defendants, even sending a message to Defendant Douvas on LinkedIn, before finally obtaining a refund of the unauthorized charges.

89.     Many consumers targeted by Leader's payment packing tactics have limited financial resources. For example, one consumer made it clear to the finance manager at Defendants' Kia of Lincolnwood franchise that she needed her payments to stay under $300 per month. After leaving the dealership, the consumer realized that over $4,500 in unauthorized add-on charges had been packed into her loan, including $999 for Xzilon that a salesperson had promised she would receive free of charge. As a result, the consumer's monthly payments exceeded $500.

90.     After discovering unauthorized charges that Defendants have packed in their deals, consumers often spend weeks or even months persistently phoning, messaging, and emailing Defendants attempting to obtain a refund. Despite such efforts, many customers do not recover their losses because Defendants typically claim that it is not possible to cancel them, regardless of any alleged misconduct. Other customers are informed that they will only be provided refunds if they agree to sign releases requiring them to take down negative online reviews. For example, a customer sought a refund for Xzilon, reporting that its $2,000 cost had been "forced into" her paperwork even after she claimed that she could not afford it. Defendants agreed to provide a refund only after the consumer threatened to bring legal action. Moreover, Defendant Douvas made the refund contingent on the consumer's willingness to sign a release and remove a negative online review.

### Consumers Regularly Complain about Defendants' Bait-and-Switch Tactics

91.     Consumers frequently complain to Defendants, auto manufacturers, the Better Business Bureau, and regulators about Leader Auto's deceptive bait-and-switch tactics. For example, on December 31, 2022, one consumer sent a detailed complaint to Leader's management team describing her unsuccessful attempt to purchase a used vehicle from Defendants' Honda dealership without also paying for Xzilon and LoJack. In her complaint, which was forwarded to Defendant Douvas, the consumer cited Plaintiffs' May 2022 enforcement action against another Chicago area automobile dealership group. *See FTC and Illinois v. North American Automotive Services, Inc. et al.*, No. 22-cv-01690 (N.D. Ill. May 25, 2022). Linking to the court complaint, the consumer highlighted sections discussing the charged dealership's practice of falsely claiming to consumers that optional add-ons were mandatory. Employees recall hearing complaints like these on a regular basis, often several times a day. A

former finance manager reported that consumers accused Defendants of engaging in bait-and-switch tactics "all the time."

92.     These complaints have been brought to the attention of Defendants' executives and managers, including Douvas, to no avail. For example, one manufacturer began raising concerns about consumer complaints just a few months into the tenure of Defendant Douvas in July 2021. The same manufacturer brought this concern to Defendants' attention again in two February 2022 letters sent to Defendant Douvas and another AutoCanada executive. The letters highlighted Leader's "disturbing Google" reviews and "numerous" "complaints from customers" about Defendants' "bait and switch" practices as well as their "costly" and "excessive" "vehicle addendums," a reference to Defendants' practice of requiring consumers to purchase add-ons like Xzilon and charging consumers more than the vehicle's advertised price. Manufacturer representatives found these complaints so troubling that they addressed them at a February 2022 in-person meeting with AutoCanada executives.

93.     In response to consumer complaints about Leader's failure to disclose charges for Xzilon and LoJack on third-party shopping websites like Cars.com, Defendants have often falsely claimed that these sites do not allow such charges to be listed. Internally, however, Defendants recognized that they should avoid putting this "excuse" in writing to consumers since it could be so easily disproven.

94.     Indeed, Defendants' failure to identify mandatory add-on charges for vehicles advertised with third-party shopping websites has been challenged by the sites themselves, which have insisted on the disclosure of these charges. Defendants have resisted complying with these requests. For example, when one website operator repeatedly questioned Leader about its practice of not including the cost of Xzilon in advertised prices, Defendants ignored these

inquiries, causing the operator to temporarily remove the inventory of three Leader dealerships from its website. Less than two months later, after the concerns appeared to be resolved, the operator conducted another audit that revealed the same deficiencies.

### Defendants Conceal and Destroy Evidence of Their Bait-and-Switch Scheme

95.     Defendants go to great lengths to conceal and destroy evidence of their bait-and-switch scheme. First, Defendants regularly destroy the forms on which their junk fees are documented. These forms, known as "pencils" or "worksheets," itemize the price of a car and any additional charges included in the deal. Pencils are typically created and printed by sales managers using a dealer management or desking tool and are then presented by sales staff to prospective buyers for the purpose of reaching a deal. Negotiations frequently produce multiple pencils before the parties agree on a final price. Along with other paperwork generated during a transaction, pencils are typically saved in files known as "deal jackets" or "deal bags."

96.     Leader's pencils often show junk reconditioning, inspection, and certification fees that Defendants require consumers to pay in addition to a vehicle's advertised price. For this reason, Defendant Douvas explicitly directed his staff to destroy pencils rather than save them in deal jackets. Dealership staff were subsequently observed by former employees shredding pencils. In August 2022, one of Douvas' top managers reprimanded a finance manager when pencils were found in his deal jackets: "pencil/worksheet in the deal-NOT ACCEPTABLE-please go through your finalized deals to make sure they are not there."

97.     Defendants also hide frontend add-on charges and junk fees from lenders by rolling them into the vehicle's purchase price, a dubious accounting practice known as "top lining" that violates bank underwriting guidelines. Although these charges and fees are typically itemized in pencils and occasionally consumers' purchase agreements, they are systematically

combined with the vehicle price on financing applications, creating what one general manager characterized as the "fake gross…for the lender."

### Unlawful Sale of Gray Market Vehicles

98.     Used vehicles originally manufactured for Canada cannot be lawfully imported for resale into the United States without meeting certain requirements set by the National Highway Traffic Safety Administration ("NHTSA") pursuant to the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 301 et seq.

99.     Even when a used Canadian vehicle is lawfully imported into the United States, importation typically voids any remaining manufacturer warranty, including the vehicle's coverage for safety recalls. As a result, consumers who purchase such vehicles must pay for any repairs that would otherwise be covered under a warranty or because of a manufacturer recall.

100.     In numerous instances, Defendants sell used vehicles to consumers in the U.S. without disclosing that the vehicles have been manufactured for the Canadian market and that any remaining factory warranty is therefore likely void. In other instances, Defendants claim that used Canadian vehicles sold to consumers in the U.S. still are covered under the manufacturer's original warranty when, in fact, such warranties are void as a result of the vehicles being imported into the United States.

101.     For example, when inquiring about a used 2020 Kia from Defendants' Chevrolet dealership, a consumer asked about warranty coverage and was informed that nearly four years remained on the factory warranty. After purchasing the Kia and being required against his wishes to pay for Xzilon, the consumer discovered that the car had been imported from Canada. The car's warranty was therefore void, the consumer learned, and his insurer would not cover any damages in the event of an accident. Months later, Defendants finally agreed to unwind the

transaction and allow him to return the car. But Leader then resold the same car to another customer without disclosing that it had been imported from Canada. Defendants also required the second owner to pay for Xzilon.

### Deceptive Consumer Reviews

102.    Consumers have posted hundreds of negative reviews online about Defendants' deceptive and unfair practices. These reviews appear on sites such as Google, Yelp, and Facebook. To offset and dilute the impact of these reviews, Defendants both require and pay their employees to post fake positive reviews of Leader dealerships.

103.    In or around March 2021, Defendants implemented a policy that forced and incentivized employees at all dealerships to generate fake five-star reviews. Defendant Douvas announced this policy to his management team in an email stating: "Those of you with a low review score and low volume of reviews its [sic] an easy fix. If you have 10 employees and they have 5 family members or friends you can have 50 reviews right away."

104.    Thereafter, Defendants induced employees to generate fake positive reviews in a variety of ways. First, Defendants have often paid bonuses or "spiffs" for fake reviews. For example, the general manager of Defendants' Hyundai of Lincolnwood dealership announced such an opportunity to his staff in November 2022, stating: "I need a minimum 10 five star reviews from each of you till the end of the month. I will pay $25 per review. Must be 5 star and must have your name in it. Example: [REDACTED] was great!" With Defendants' approval, managers of other Leader dealerships offered the same type of rewards for positive reviews. As a result, salespeople have occasionally earned more from writing and posting fake reviews than they have from selling cars.

105.     Defendants also have often withheld, or threatened to withhold, compensation from employees until they show that they have posted a specified quota of fake reviews. Defendants have frequently tied this requirement to bonuses earned from the sale of Xzilon, which can be as much as $500 in cash per sale. In many instances, Defendants have required their employees to sign a written agreement confirming that they will provide two five-star Google reviews within 72 hours of a single sale or forfeit their $500 Xzilon bonus. Defendant Douvas personally approved this policy. In other instances, Defendants have set a weekly review quota unconnected to the number of vehicles sold by individual employees. At least one employee has been formally reprimanded for not complying with this policy, while others have been berated by management in front of their colleagues.

106.     Defendants offer bonuses to managers whose dealerships achieve an overall Google review rating above a certain threshold, typically 4.7 stars, and circulate weekly summaries of each location's Google review metrics. This has further incentivized dealership managers to coerce their employees into posting fake positive reviews. For example, on January 2, 2023, after receiving one of Defendants' weekly review summaries, the general manager of Defendants' Peoria dealership sent the following all-caps email to his staff:

> TEAM…THIS REPORT COMES OUT EVERY WEEK…I AM DONE LOOKING BAD ON IT…CONSIDER IT MANDATORY TO GET ONE REVIEW EVERY DAY UNTIL FURTHER NOTICE…

Similarly, on February 6, 2023, after receiving a weekly report, the general manager of Defendants' Hyundai of Lincolnwood dealership instructed his managers to "focus on reviews" by requiring "2 reviews per Xzilon, lojack spiff from sales." A week later, the same general manager sent the following email to his staff: "We need more reviews team. Please make sure to require at least 2 reviews per xzilon/ lojack spiff."

107. Defendants know that the positive reviews they induce their employees to generate are not truthful reviews by actual customers of the dealerships.

108. In addition to requiring employees to post fake positive reviews, Defendants frequently have pressured, bullied, and extorted customers into posting reviews that do not represent their actual experiences, views, or opinions. For example, a customer defrauded by Leader's Toyota of Lincolnwood dealership could not obtain the keys to her new vehicle until she posted a five-star review of the dealership, which she did despite not wanting to leave a positive review.

109. Defendants also take steps to prevent online review sites and actual customers from discovering their scheme. For example, a manager at one Leader dealership used phony email addresses and prepaid "burner" cell phones to submit fake reviews. Leader's marketing manager instructed employees not to submit fake reviews while connected to Defendants' Wi-Fi, to ensure that reviews are "spaced out" chronologically, and not to use "the same copy and paste content," which, the manager warned, "could possibly lead to our [Google] business page getting shut down."

### Corporate Defendants' Failure to Provide the Required Buyers Guide

110. Leader Auto sold approximately 11,178 used vehicles at their ten Illinois dealerships in 2022; in 2021, they sold 8,872. Leader is therefore subject to the FTC's Used Car Rule and its requirements relating to Buyers Guides.

111. Since at least April 2021, in numerous instances, Defendants have failed to prepare, fill in as applicable, and prominently and conspicuously display a Buyers Guide on used vehicles being offered for sale to consumers. In numerous other instances, Defendants have failed to give customers an original or copy of the Buyers Guide as part of the deal paperwork provided to customers.

**Defendants' Failure to Include Required Disclosures in Direct Mailers in Violation of Illinois Law**

112.     Between February 2022 and August 2022, Defendants caused direct mail advertisements to be mailed out to hundreds of thousands of Illinois residents inviting them to visit one of Defendants' dealerships to receive a prize ("prize mailer").

113.     Defendant Douvas signed each of the purchase orders and agreements with the vendor that produced and sent out all the prize mailers on behalf of Defendants.

114.     While there were some differences among the prize mailers sent out on behalf of each dealership, such as the name and address of the dealership or the make of the vehicles displayed, all of the prize mailers contained similar characteristics and representations.

115.     Each prize mailer advertisement included pull tabs for consumers to match hidden symbols to see if they had won and instructing the consumer to bring the mailer in to one of Defendants' dealerships to claim a prize or otherwise participate in various "giveaways" for items such as cash, an Apple Watch, or Smart TV.

116.     Each prize mailer included various offers relating to the sale of new and used vehicles.

117.     The bottom of each prize mailer contained a paragraph of eight lines of disclaimers and disclosures written in font significantly smaller than any other text on the prize mailers, relating back to no less than five different asterisks or similar identifiers referring to offers or contests appearing throughout the mailer. An exemplar of one of the prize mailers appears below as Image D.



**Image D: Example Prize Mailer**

118.    The Illinois Prizes and Gifts Act requires that in a written promotional offer that invites a person to claim a prize, attend a sales presentation, meet a promoter, sponsor, salesperson, or agent, or conduct any business in the State of Illinois, the offer must clearly and conspicuously disclose at the onset of the offer that: (3) that no purchase is necessary to enter such written promotional offer and (4) that a purchase will not improve the person's chance of winning with an entry. 815 ILCS 525/25(3), (4).

119.    The prize mailers sent out by Defendants in 2022 failed to disclose clearly and conspicuously at the onset of the offer that no purchase is necessary to enter the written promotional offer.

120.    The prize mailers sent out by Defendants in 2022 failed to clearly and conspicuously disclose at the onset of the offer that a purchase will not improve the person's chances of winning with an entry.

121.    Each of the prize mailers sent out by Defendants in 2022 included closed-end credit terms relating to the sale of a motor vehicle.

122.    Each of the prize mailers sent out by Defendants in 2022 included an offer to purchase a vehicle with "$0 DOWN," with no other information or terms accompanying the offer apart from a tilde (~) directing the consumer to a specific sentence embedded in the eight lines of disclaimers and disclosures which appeared in small font at the bottom of the mailer.

123.    The disclaimer indicated by the tilde, in each of the prize mailers states "on select vehicles with approved credit, plus tax, license, title fees, and documentary service fee."

124.    Section 475.610 of the Illinois Motor Vehicle Advertising Regulations prohibits dealers from advertising "closed-end credit" terms in an advertisement, offer of sale, or sale of

any motor vehicle if the advertisement contains a "triggering term" such as the amount of down payment. ILL. ADMIN. CODE tit. 14, § 475.610.

125.     In the event the dealer uses a "triggering term," it must clearly and conspicuously disclose: a) the amount or percentage of any down payment, terms of repayment, and "annual percentage rate" using that term spelled out in full or the abbreviation "APR", b) the contractual amount owing at the conclusion of a pre-determined schedule of installment payments, in close proximity to and, where applicable, in the same decibel tone as, the "triggering term" when a dealer advertises the availability of balloon-note financing, and c) a manufacturer's or manufacturer captive finance company's tiered financing offer. ILL. ADMIN. CODE tit. 14, § 475.610.

126.     By stating "$0 DOWN" in the mailer, Defendants were required to clearly and conspicuously make certain disclosures, including terms of repayment, annual percentage rate, and the manufacturer's or manufacturer's captive finance company's tiered financing offer, and failed to do so.

127.     In addition to not being clear and conspicuous, the disclaimer indicated by the tilde in each of the prize mailers failed to disclose terms of repayment, annual percentage rate, and the manufacturer or manufacturer's captive finance company's tiered financing offer as required by ILL. ADMIN. CODE tit. 14, § 475.610.

128.     Each of the prize mailers sent out by Defendants in 2022 included an offer to finance a vehicle at a specific annual percentage rate or APR for a set number of months with no other terms relating to the specific financing offer, apart from a hashtag (#) directing the consumer to the eight lines of disclaimers and disclosures at the bottom of the mailer.

129.    Section 475.630 of the Illinois Motor Vehicle Advertising Regulations requires that any advertisement that includes a finance rate or APR, must also disclose, if such is the fact, a) that such rate is limited to certain models; b) that the price may be increased by a dealer's contribution to lower the rate; c) that to take advantage of such a reduced rate, a customer must purchase additional options or services; d) that taking advantage of the rate will increase the final price of the vehicle or options or services purchased; e) that the offer expires after a limited time period; and f) any other conditions, qualifications or limitations which materially affect the availability of such rate. ILL. ADMIN. CODE tit. 14, § 475.630.

130.    By including an APR in an advertisement, Defendants were required to disclose, and failed to disclose: whether the rate was limited to certain models; whether the price may be increased by a dealer's contribution to lower the rate; whether, to take advantage of such a reduced rate, a customer must purchase additional options or services; whether taking advantage of the rate will increase the final price of the vehicle or options or services purchased; and any other conditions, qualifications or limitations which materially affect the availability of such rate.

131.    For example, the prize mailer sent out by Defendants in August 2022 to approximately 25,000 consumers contained an offer stating "FINANCING STARTING AT 2.79% APR FOR 60 MONTHS ON SELECT NEW MODELS!" accompanied by a superscript hashtag directing consumers to the eight lines of disclaimers and disclosures.

132.    The disclosures referenced by the hashtag in the August 2022 prize mailer from Defendant ACIA PH provided "#Monthly payment is $17.88 for every $1,000 you finance. Must finance with Hyundai Motor Finance. Some customers may not qualify. Not available with lease and some other offers. See dealer for complete details."

133.    The disclosures referenced by the hashtag in the August 2022 prize mailer from Defendant ACIA PH failed to disclose whether the rate was limited to certain models; whether the price may be increased by a dealer's contribution to lower the rate; whether, to take advantage of such a reduced rate, a customer must purchase additional options or services; whether taking advantage of the rate will increase the final price of the vehicle or options or services purchased; and any other conditions, qualifications or limitations which materially affect the availability of such rate.

134.    Similarly, the prize mailer sent out by Defendant ACIA PG in April 2022 to approximately 25,000 consumers contained an offer stating "0% APR FINANCING ON MOST NEW MODELS" accompanied by a superscript hashtag directing consumers to the eight lines of disclaimers and disclosures.

135.    The disclosures referenced by the hashtag in the April 2022 prize mailer from Defendant ACIA PG provided "#Length of contract is limited. Must finance with GM Financial. Some customers may not qualify. Not available with lease and some other offers. See dealer for complete details."

136.    The disclosures referenced by the hashtag in the April 2022 prize mailer from Defendant ACIA PG failed to disclose whether the rate was limited to certain models; whether the price may be increased by a dealer's contribution to lower the rate; whether, to take advantage of such a reduced rate, a customer must purchase additional options or services; whether taking advantage of the rate will increase the final price of the vehicle or options or services purchased; and any other conditions, qualifications or limitations which materially affect the availability of such rate.

137.    The prize mailers sent out by Defendants advertised that consumers would have "no payments until summertime," "no payments for 2 months," or "no payments for 3 months" followed by a superscript dagger (†) directing consumers to the terms or conditions buried in the eight lines of disclaimers and disclosures appearing at the bottom of the mailer, which only provided, "Interest accrues from the date of purchase. First payment due 90 days from purchase date. With approved credit. Not all buyers will qualify. See dealer for details."

138.    The disclosures related to the offer of no initial monthly payments did not include all material terms and conditions relating to the offer, such as whether consumers would need to make up those payments later or if the payments were waived outright; whether the offer was available for all vehicles, new and used; or whether, to take advantage of the offer, consumers needed to finance with a specific lender and any of the terms of such financing.

139.    Section 475.210 of the Illinois Motor Vehicle Advertising Regulations requires that for any offer to sell a motor vehicle, all material terms and conditions relating to the offer must be clearly and conspicuously disclosed at the outset of the offer so as to leave no reasonable probability that the offering might be misunderstood. ILL. ADMIN. CODE tit. 14, § 475.210.

140.    Defendants, by offering to sell a vehicle to consumers and allowing them to delay their first payment, were required to disclose all material terms and conditions of the offer clearly and conspicuously at the outset of the offer and failed to do so.

## Defendants' Failure to Include All Costs to the Consumer in Advertised Prices in Violation of Illinois Law

141.    Defendants maintain websites where they advertise new and used vehicles for sale.

142.    For example, Defendants maintain the website https://www.toyotalincolnwood.com where they advertise new and used vehicles for sale.

44

143.     Similarly, Defendants maintain the website https://www.chevroletofpalatine.com where they advertise new and used vehicles for sale.

144.     Section 475.310 of the Illinois Motor Vehicle Advertising Regulations requires that when a dealer advertises the total price of a motor vehicle it must include in the advertised price all costs to the purchaser at the time of sale, including all costs which are necessary or usual prior to delivery of such vehicle to the purchaser, including any costs of delivery, dealer preparation, and any other charges of any nature except for taxes, license and title fees, and a documentary service fee. ILL. ADMIN. CODE tit. 14, § 475.310.

145.     In numerous instances, Defendants failed to include all costs to the consumer in the prices advertised on their websites.

146.     For example, on January 11, 2022, Defendants advertised a 2021 Chevrolet Camaro 3LT, stock number CP154 for the "Cash" price of $45,415 on their website, https://www.chevroletofpalatine.com.

147.     On the website advertising the 2021 Chevrolet Camaro 3LT, stock number CP154, Defendants included a disclaimer which provided, in part, "Price excludes options; taxes; title; registration; delivery, processing and handling fee; dealer charges; dealer-installed accessories."

148.     Similarly, on January 10, 2022, Defendants advertised a 2022 Hyundai Santa Cruz SEL, stock number HLW537, for the "FINAL PRICE" of $33,055 on their website, https://www.hyundaioflincolnwood.com.

149.     On the website advertising the 2022 Hyundai Santa Cruz SEL, stock number HLW537, Defendants included a disclaimer which provided, in part, "Price excludes options;

taxes; title; registration; delivery, processing and handling fee; dealer charges; dealer-installed accessories."

150.    On January 13, 2022, Defendants advertised a 2021 Kia Sorento S FWD 4D, stock number KLMG010566 with a "CASH" price of $33,380 on their website, https://www.kiaoflincolnwood.com.

151.    On the website advertising the 2021 Kia Sorento S FWD 4D, stock number KLMG010566, Defendants included a disclaimer which provided, in part, "Price excludes options; taxes; title; registration; delivery, processing and handling fee; dealer charges; dealer-installed accessories."

152.    In May 2022, Defendants sent out a prize mailer to approximately 25,000 consumers which included an advertisement for a 2017 Toyota Avalon with stock number R245 for "$16,999!" and a 2019 Jeep Cherokee with stock number R176 for "$22,900!" with the price for each vehicle accompanied by a superscript caret directing consumers to eight lines of disclaimers and disclosures.

153.    The disclosure referenced by the caret in the May 2022 mailer from Defendant ACIA CL provided, "All prices plus tax, license, title fees and documentary service fee. Prices do not include dealer installed accessories."

154.    On June 7, 2024, Defendant ACIA TN advertised a 2024 Toyota Rav4 Hybrid XLE Premium, stock number JTMB6RFV, for the "Selling Price" of $39,914.00, on its website, https://www.toyotalincolnwood.com.

155.    On the website advertising the 2024 Toyota Rav4 Hybrid XLE Premium, stock number JTMB6RFV, Defendant ACIA TN included a disclaimer that could only be viewed in full by either clicking on "Read More" at the end of a partial disclaimer, or by clicking on the

46

letter "i" next to the monthly payment offer, which provided, in part, "All taxes, license and title fees and $358.03 doc fee not included. . . Dealer installed accessories are extra."

156.    For each of the vehicles referenced in Paragraphs 145 to 155 above, Defendants excluded costs such as delivery, processing and handling fees; "dealer charges"; and dealer installed accessories from the advertised price.

157.    Under Illinois law, Defendants, by advertising a total price for the vehicles described in Paragraphs 145-155 above, were required to include all costs to the consumer in the price, except for taxes, license and title fees, and a documentary service fee, and failed to do so.

**Defendants Sold Vehicles for More than the Advertised Price in Violation of Illinois Law**

158.    Defendants advertised vehicles on their websites with a corresponding stock number to specifically identify the vehicle and a sales price for each vehicle.

159.    Section 475.310 of the Illinois Motor Vehicle Advertising Regulations requires that all consumers be able to purchase all advertised vehicles at their advertised price. ILL. ADMIN. CODE tit. 14, § 475.310.

160.    Defendants must sell or lease all advertised vehicles to consumers for the lowest advertised price, regardless of whether or not consumers knew of the advertised price. ILL. ADMIN. CODE tit. 14, § 475.310.

161.    In numerous instances, Defendants sold a vehicle at a price that exceeded the price advertised online for that specific vehicle on the date of the sale, not including any separate charges for add-on products.

162.    For example, on February 10, 2022, Defendants advertised on their website a 2022 Chevrolet Suburban with stock number CP194 for the "CASH" price of $68,985.

163.    On February 10, 2022, Defendants sold the 2022 Chevrolet Suburban with stock

number CP194 to a consumer for the cash price of $71,998, in addition to separately charging the consumer $1,595 for "Aftermarket," $2,500 for a service contract, and $578 for GAP coverage.

164.    Similarly, on January 6, 2022, Defendants advertised a 2021 Toyota RAV4 with stock number TLW829 on their website for the "CASH" price of $27,834.

165.    On January 6, 2022, Defendants sold the 2021 Toyota RAV4 with stock number TLW829 to a consumer for the cash price of $38,500, in addition to separately charging the consumer $1,300 for "Aftermarket," $3,398 for a service contract, $850 for GAP coverage, and $1998 for "JMA."

166.    From January 7, 2022 through January 25, 2022, Defendants advertised a 2021 Kia Sorento with stock number KLMG010566 on their website for the "CASH" price of $33,380.

167.    On January 24, 2022, Defendants sold the 2021 KIA Sorento with stock number KLMG010566 to a consumer for the cash price of $38,240, in addition to separately charging the consumer $1,720 for "Aftermarket," $3,755 for a service contract, and $993 for GAP coverage.

168.    From at least January 6, 2022 through January 31, 2022, Defendants advertised a 2022 Hyundai Tucson SEL with stock number HLW691 on their website for a "CASH" price of $32,805.

169.    On January 31, 2022, Defendants sold the 2022 Hyundai Tucson SEL with stock number HLW691 to a consumer for the cash price of $34,805, in addition to separately charging the consumer $2,599 for "Aftermarket."

* * *

170.    Based on the facts and violations of law alleged in this Complaint, the FTC has

reason to believe that Defendants are violating or are about to violate laws enforced by the

Commission and the People of the State of Illinois.

## VIOLATIONS OF THE FTC ACT

171.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

or practices in or affecting commerce."

172.    Misrepresentations or deceptive omissions of material fact constitute deceptive

acts or practices prohibited by Section 5(a) of the FTC Act.

173.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are

likely to cause substantial injury to consumers that consumers cannot reasonably avoid

themselves and that is not outweighed by countervailing benefits to consumers or competition.

15 U.S.C. § 45(n).

**Count I**
**Misrepresentations Regarding Add-Ons and Fees**
**(by Plaintiff FTC against all Defendants)**

174.    In numerous instances, in connection with the advertising, marketing, promoting,

or offering for sale, lease, or financing, or sale, lease, or financing of vehicles, Defendants have

represented, directly or indirectly, expressly or by implication, that:

   a.   To purchase, lease, or finance vehicles, consumers are required to purchase

        add-ons, including Xzilon and LoJack;

   b.   To purchase, lease, or finance vehicles, consumers are required to pay certain

        fees, such as for inspecting, reconditioning, or certifying vehicles; or

   c.   Leader Auto has installed or will install the add-ons that they require

        consumers to purchase.

175.    In fact, in numerous instances in which Defendants have made the representations described in Paragraph 174:

    a.    Consumers are not required to purchase add-ons, including Xzilon and LoJack, in order to purchase, lease, or finance vehicles;

    b.    Consumers are not required to pay inspection, reconditioning, or certification fees to purchase, lease, or finance vehicles; and

    c.    Leader Auto has not and does not install the add-ons that they require consumers to purchase.

176.    Therefore, Defendants' representations as described in Paragraph 174 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**
**Misrepresentations Regarding Advertised Prices**
**(by Plaintiff FTC against all Defendants)**

177.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, lease, or financing, or sale, lease, or financing of vehicles, including through the means described above, Defendants represent, directly or indirectly, expressly or by implication, that Defendants will sell, lease, or finance particular vehicles at specific prices.

178.    In fact, in numerous instances in which Defendants make the representations described in Paragraph 177, Defendants do not sell, lease, or finance the vehicles at those prices.

179.    Therefore, Defendants' representations as described in Paragraph 177 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III**
**Misrepresentations Regarding Certification**
**(by Plaintiff FTC against Corporate Defendants)**

180.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, lease, or financing, or sale, lease, or financing of vehicles, the Corporate Defendants represent, directly or indirectly, expressly or by implication, that Leader Auto will sell, lease, or finance a certified used vehicle with a limited manufacturer warranty.

181.    The Corporate Defendants' representations as described in Paragraph 180 are false or misleading or were not substantiated at the time the representations were made.

182.    Therefore, the Corporate Defendants' representations as described in Paragraph 180 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count IV**
**Misrepresentations Regarding Gray Market Cars**
**(by Plaintiff FTC against all Defendants)**

183.    In numerous instances in connection with the advertising, marketing, promoting, offering for sale, lease, or financing, or sale, lease, or financing of vehicles, Defendants represent directly or indirectly, expressly or by implication, that a vehicle available for purchase is covered by a manufacturer warranty, including any coverage for safety recalls.

184.    In fact, in numerous instances in which Defendants have made the representations described in Paragraph 183 the vehicle is not covered by any manufacturer warranty because the vehicle was manufactured for use in Canada and imported into the United States, which can void warranty coverage, including any coverage for safety recalls.

185.     Therefore, Defendants' representation as described in Paragraph 183 is false or misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count V
### Deceptive Consumer Reviews
### (by Plaintiff FTC against all Defendants)

186.     Through the means described in Paragraphs 102 through 109, Defendants have represented, directly or indirectly, expressly or by implication, that reviews of Leader Automotive dealerships are truthful reviews by actual customers of the dealerships.

187.     In fact, in numerous instances in which Defendants have made the representations described in Paragraph 186, the reviews of Leader Automotive dealerships were not truthful reviews by actual customers, but instead were either: a) fabricated by individuals paid or otherwise induced by Defendants to generate positive reviews; or b) from customers coerced by Defendants into writing a positive review that did not reflect the customers' experiences, views, or opinions.

188.     Therefore, Defendants' representations as described in Paragraph 186 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VI
### Unfair Acts or Practices Relating to Add-On Charges
### (by Plaintiff FTC against all Defendants)

189.     In numerous instances, Defendants have charged consumers for add-ons without obtaining consumers' express, informed consent.

190.    The actions of Defendants, as described in Paragraph 189 have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

191.    Therefore, Defendants' acts or practices as described in Paragraph 189 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

### Count VII
### Unfair Acts or Practices Relating to the Sale of Gray Market Cars
### (by Plaintiff FTC against all Defendants)

192.    In numerous instances, Defendants have offered for sale, sold, leased, or financed vehicles in the United States that were manufactured for use in Canada without disclosing that the importation of those vehicles into the United States may void the manufacturer warranty, including any coverage for safety recalls.

193.    Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

194.    Therefore, Defendants' acts or practices as described in Paragraph 192 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

### VIOLATIONS OF THE USED CAR RULE

195.    In 1975, Congress passed the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., which required the Commission to initiate a rulemaking in connection with used car warranties using both the authority granted by the Magnuson-Moss Warranty Act and the rulemaking procedures set forth in Section 18 of the FTC Act, 15 U.S.C. § 57a.

196.    Pursuant to this authority, the Commission issued the Used Car Rule, which became effective on May 19, 1985, to create a remedy for oral misrepresentations and unfair

omission of material facts by used car dealers concerning warranty coverage, including untrue and unenforceable promises about dealers' responsibilities and willingness to make repairs after sale.

197.   The Used Car Rule provides a uniform method for disclosing warranty information on a window sticker called the "Buyers Guide" that dealers are required to display prominently and conspicuously on used vehicles offered for sale to consumers. The Rule also requires dealers to provide consumers with an original or copy of the Buyers Guide at the sale of a used vehicle.

198.   The Used Car Rule protects consumers from potential post-purchase problems in several ways. First, the Buyers Guide may prompt consumers to have a vehicle inspected before purchase. Second, the Buyers Guide requires dealers to provide consumers with warranty information so that if consumers so wish, they can shop for a vehicle with a warranty that protects them in the event that the car subsequently has mechanical problems. Third, the Buyers Guide warns consumers not to rely on verbal promises and to obtain assurance about a vehicle from the dealer in writing.

199.   At all times material hereto, the Corporate Defendants have been "dealers" as that term is defined in the Used Car Rule, 16 C.F.R. § 455.1(d)(3), and have offered for sale and sold "vehicles" and "used vehicles" to "consumers," as those terms are defined in the Used Car Rule, 16 C.F.R. § 455.1(d)(1), (2), and (4).

200.   The Used Car Rule requires that, on a used vehicle offered for sale to a consumer, dealers prepare, fill in, and prominently and conspicuously display a Buyers Guide on the vehicle in such a fashion that both sides are readily readable. 16 C.F.R. § 455.2. The Rule also requires

dealers to give buyers of a used vehicle the original or a copy of the vehicle's Buyers Guide. 16 C.F.R. § 455.3.

201.     Pursuant to Section 110(b) of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(b), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Used Car Rule constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count VIII**
**Used Car Rule Violations**
**(by Plaintiff FTC against Corporate Defendants)**

202.     In numerous instances, the Corporate Defendants fail to prepare, fill in as applicable, or display, prominently and conspicuously and in a readily readable manner, a Buyers Guide on used vehicles offered for sale to consumers.

203.     In numerous other instances, the Corporate Defendants fail to provide buyers of used vehicles with the original or a copy of the vehicle's Buyers Guide.

204.     Therefore, the Corporate Defendants' acts or practices as described in Paragraphs 202 and 203 violate the Used Car Rule, 16 C.F.R. §§ 455.2 and 455.3, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**<u>VIOLATIONS OF ILLINOIS LAW</u>**

**The Illinois Consumer Fraud Act**

205.     Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act") provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform

55

Deceptive Trade Practices Act," approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2.

206.    Section 7 of the Illinois Consumer Fraud Act provides:

(a)    Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction, revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver, dissolution of domestic corporations or association suspension or termination of the right of foreign corporation or associations to do business in this State; and restitution.

(b)    In addition to the remedies provide herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

(c)    In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

815 ILCS 505/7.

207.    Section 10 of the Illinois Consumer Fraud Act provides, "In any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State." 815 ILCS 505/10.

### The Illinois Prizes and Gifts Act

208.    Section 15 of the Illinois Prizes and Gifts Act, 815 ILCS 525/15, provides:

> Application of Act. Except as otherwise provided in this Act, this Act applies only to a written promotional offer that is:
>
> (1) Made to a person in this state;
> (2) Used to induce or invite a person to come to this State to claim a prize, attend a sales presentation, meet a promoter, sponsor, salesperson, or agent, or conduct any business in this State; or
> (3) Used to induce or invite a person to contact by any means a promoter, sponsor, salesperson, or agent in this State.

815 ILCS 525/15.

209.    Section 25 of the Illinois Prizes and Gifts Act, 815 ILCS 525/25, provides, in relevant part, the following:

> Sec. 25. Disclosures required. A written promotional prize offer must contain each of the following in a clear and conspicuous statement at the onset of the offer:
>
> ….
>
> (3) a disclosure that no purchase is necessary to enter such written promotional offer;
> (4) a disclosure that a purchase will not improve the person's chances of winning with an entry…

815 ILCS 525/25.

210.    Section 40(c) of the Illinois Prizes and Gifts Act, 815 ILCS 525/40, provides, in relevant part, the following:

> Enforcement by Attorney General or State's Attorney. Violation of any of the provisions of this Act is an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act. All remedies, penalties, and authority granted to the Attorney General or State's Attorney by that Act shall be available to him or her for the enforcement of this Act.

815 ILCS 525/40(c).

## Illinois Uniform Deceptive Trade Practices Act

211.     Section 2 of the Illinois Uniform Deceptive Trade Practices Act provides in

relevant part:

> (a)     A person engages in a deceptive trade practice when, in the course of
> his or her business, vocation, or occupation, the person:
> ....
> (2)      causes likelihood of confusion or of misunderstanding as to
> the source, sponsorship, approval, or certification of goods or
> services;
> ....
> (5)      represents that goods or services have sponsorship, approval,
> characteristics, ingredients, uses, benefits, or quantities that they do
> not have or that a person has a sponsorship, approval, status,
> affiliation, or connection that he or she does not have;
> ....
> (7)      represents that good or services are of a particular standard,
> quality, or grade or that goods are a particular style or model, if they
> are another;
> ....
> (9)      advertises good or services with intent not to sell them as
> advertised;
> ....
> (12)     engages in any other conduct which similarly creates a
> likelihood of confusion or misunderstanding.
>
> (b)      In order to prevail in an action under this Act, a plaintiff need not
> prove competition between parties or actual confusion or misunderstanding.

815 ILCS 510/2.

## The Illinois Administrative Code

212.     Pursuant to Section 4 of the Consumer Fraud Act, 815 ILCS 505/4, the Illinois

Attorney General promulgated the Illinois Administrative Rules on Motor Vehicle Advertising,

ILL. ADMIN CODE tit. 14, § 475, which have the force of law.

213.     Section 475 of the Illinois Administrative Code, in relevant portions, defines the

following:

"Clear and conspicuous"… means that the statement, representation or term being conveyed is in close proximity to the statement, representation or term it clarifies, modifies, or explains, or to which it otherwise relates; readily noticeable; reasonably understandable by the person(s) to whom it is directed; and not contradictory to any terms it purports to clarify, modify or explain.

A statement, representation, or term is not clear and conspicuous unless it shall:

For printed, written, typed or graphic advertisements:

….

be of sufficient prominence in terms of print, size and color contrast, as compared with the remainder of the advertisement, so as to be readily noticeable to the person(s) to whom it is directed. Any type size which is 10-point type or larger is deemed readily noticeable.

ILL. ADMIN. CODE tit. 14, § 475.110.

214.    Section 475 of the Illinois Administrative Code, in relevant portions, further

provides as follows:

Clear and Conspicuous – Disclosure of Material Terms

It is an unfair or deceptive act to advertise, offer for sale or sell any motor vehicle without disclosing all material terms and conditions relating to the offer clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the offering might be misunderstood. Material terms include, without limitation, those mandated by federal law including, but not limited to, those Acts listed in Section 475.250, or state law, or without which the advertisement would be false or misleading.

ILL. ADMIN. CODE tit. 14, § 475.210.

Advertised Price

It is an unfair or deceptive act to advertise the total price of a motor vehicle without including in the advertised price all costs to the purchaser at the time of sale, or which are necessary or usual prior to delivery of such vehicle to the purchaser, including any costs of delivery, dealer preparation and any other charges of any nature; provided, however, taxes, license and title fees and a documentary service fee, as defined herein, may be excluded from the advertised price if clearly disclosed in the advertisement that these costs are excluded from the advertised price. Purchasers shall be able to purchase all vehicles described by the advertisement at the advertised price.

ILL. ADMIN. CODE tit. 14, § 475.310.

Contract Add-ons

It is an unfair or deceptive practice for a dealer to negotiate the terms of a sale and thereafter add the cost of items including, without limitation, extended warranties, credit life, dealer preparation, or undercoating, to the contract without previously disclosing same to the consumer and without the consumer's consent.

ILL. ADMIN. CODE tit. 14, § 475.580.

Credit Sales Advertising Disclosure

It is an unfair or deceptive act to advertise "closed-end credit" terms in the advertisement, offer of sale, or sale of any motor vehicle if the advertisement contains any one of following five "triggering terms": amount or percentage of down payment; number of payments; period of repayment; amount of any payment (expressed as percentage or dollar amount); or amount of any finance charge, without clearly and conspicuously disclosing.

a)      amount or percentage of any down payment, terms of repayment, and "annual percentage rate" using that term spelled out in full or the abbreviation "APR".  If the annual percentage rate may be increased after the contract is signed, that fact must be disclosed. An advertisement that complies with the Federal Truth in Lending Act (15 USC 1601 et seq.) and amendments thereto, and any regulations issued or that may be issued under that federal statute, shall be deemed in compliance with the provisions of this subsection.

b)      the contractual amount owing at the conclusion of a pre-determined schedule of installment payments, in close proximity to and, where applicable, in the same decibel tone as, the "triggering term" when a dealer advertises the availability of balloon-note financing. For the purpose of this subsection (b), balloon-note financing shall mean the manner of purchase whereby a consumer agrees to select and perform, at the conclusion of a pre-determined schedule of installment payments made in periodic or monthly amounts, one of the following options:

1)      satisfy the balance of the contractual amount owing;
2)      refinance any balance owing, on the terms previously agreed upon at the time of executing the retail installment contract; or
3)      surrender the vehicle at such time and manner agreed upon at the time of executing the retail installment contract.

c)      a manufacturer's or manufacturer captive finance company's tiered financing offer.  For the purpose of this subsection (c), tiered financing shall mean the manner of financing a purchase whereby a consumer must qualify for a specific manufacturer's or manufacturer captive finance company's offer according to pre-established credit qualifications.

Proper disclosures might include:

Ad copy:                    1.9% APR for 48 months

Disclosure:                 Financing subject to credit approval and insurability. 1.9% financing for 48 months on (vehicle make/model) in lieu of rebate to qualified buyers and ends (date). 48 months at ($ amount) per month per $1000 financed at 1.9% APR (level a, b, c) with 10% down on (vehicle make/model). Finance rate varies depending on credit worthiness of customer as determined by (captive finance company).  Some customers will not qualify.

ILL. ADMIN. CODE tit. 14, § 475.610.

Advertised Finance Rate

It is an unfair or deceptive act to advertise a finance rate (APR) without disclosing, if such is the fact, the following:

(a)      that such rate is limited to certain models;
(b)      that the price may be increased by a dealer's contribution to lower the rate;
(c)      that to take advantage of such a reduced rate, a customer must purchase additional options or services;
(d)      that taking advantage of the rate will increase the final price of the vehicle or options or services purchased;
(e)      that the offer expires after a limited time period; and
(f)      any other conditions, qualifications or limitations which materially affect the availability of such rate.

ILL. ADMIN. CODE tit. 14, § 475.630.

**Count IX**
**Violations of the Illinois Consumer Fraud Act**
**(by Plaintiff State of Illinois against all Defendants)**

215.     The Illinois Attorney General re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs.

216.     Defendants, in the course of trade or commerce, have in numerous instances engaged in conduct which constitutes unfair and deceptive acts or practices declared unlawful under Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by:

    A.     Misrepresenting directly or indirectly, expressly or by implication, with the intent that consumers rely on the misrepresentation, that to purchase, lease or finance vehicles, consumers are required to purchase add-on products including Xzilon and LoJack;

    B.     Misrepresenting directly or indirectly, expressly or by implication, with the intent that consumers rely on the misrepresentation, that to purchase, lease, or finance vehicles, consumers are required to pay certain fees, such as for inspecting, reconditioning, or certifying vehicles;

    C.     Misrepresenting directly or indirectly, expressly or by implication, with the intent that consumers rely on the misrepresentation, that Defendants have installed or will install the add-on products that they require consumers to purchase;

    D.     Charging consumers for add-on products, such as Xzilon or LoJack, and then failing to either provide those products or provide the consumer a refund;

E.      Misrepresenting directly or indirectly, expressly or by implication, with the intent that consumers rely on the misrepresentation, that a vehicle is available for purchase even though that vehicle has been sold or is otherwise unavailable for purchase;

F.      Misrepresenting directly or indirectly, expressly or by implication, with the intent that consumers rely on the misrepresentation, that a used vehicle available for purchase is certified and, therefore, includes a limited manufacturer warranty;

G.      Misrepresenting directly or indirectly, expressly or by implication, with the intent that consumers rely on the misrepresentation, that a vehicle available for purchase is covered by a manufacturer warranty, including any coverage for safety recalls;

H.      Misrepresenting to consumers, directly or indirectly, expressly or by implication, with the intent that consumers rely on the misrepresentation, that Defendants will sell a vehicle for a specific price and then selling the vehicle for a greater price;

I.       Deceiving consumers, with the intent that consumers rely on the deception, as to the reputation of the Defendants' dealerships by encouraging and incentivizing the posting of fake positive reviews; and

J.       Charging consumers for the purchase of optional add-on products without obtaining informed consent from the consumers for such charges.

217.    Defendants, in the course of a business, vocation, or occupation, have in numerous instances engaged in deceptive trade practices in violation of Section 2 of the Illinois

Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, and therefore in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by:

    A.    Advertising and selling used vehicles as "certified" without actually obtaining manufacturer certification for that vehicle causing a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services in violation of 815 ILCS 510/2(a)(2);

    B.    Representing that add-on products such as Xzilon or LoJack were already installed on a vehicle when such products had not been installed thereby representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have in violation of 815 ILCS 510/2(a)(5);

    C.    Encouraging and incentivizing the posting of fabricated positive online reviews thereby representing that Defendants' goods and services are of a particular standard, quality, or grade, in violation of 815 ILCS 510/2(a)(7); and

    D.    Advertising vehicles for a specific price and then charging consumers more than advertised, including by requiring the purchase of add-on products, thereby advertising goods or services with the intent not to sell them as advertised in violation of 815 ILCS 510/2(a)(9).

218.    While engaged in a course of trade or commerce, Defendants violated the Illinois Prizes and Gifts Act, 815 ILCS 525/1 et seq., by offering a written promotional offer to Illinois

consumers to induce consumers to visit a dealership owned and operated by Defendants in order to receive a prize and failing to include in the written promotional offer:

    A.    A disclosure that no purchase is necessary to enter such written promotional offer in violation of Section 25(2) of the Illinois Prizes and Gifts Act, 815 ILCS 525/25(3); and

    B.    A disclosure that a purchase will not improve the person's chances of winning with an entry in violation of Section 25(3) of the Illinois Prizes and Gifts Act, 815 ILCS 525/25(4).

**Count X**
**Violations of the Illinois Administrative Code**
**(by Plaintiff State of Illinois against all Defendants)**

219.    The Illinois Attorney General re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs.

220.    Defendants violated the Illinois Motor Vehicle Advertising Regulations, ILL. ADMIN. CODE tit. 14 §475.110, et seq., by:

    A.    Advertising, offering for sale, or selling motor vehicles without disclosing all material terms and conditions relating to the offer clearly and conspicuously at the outset of the offer in violation of Section 475.210;

    B.    Advertising the total price of a motor vehicle without including in the advertised price all costs to the purchaser at the time of sale, or which are necessary or usual prior to delivery of such vehicle to the purchaser, including any costs of delivery, dealer preparation and any other charges of any nature in violation of Section 475.310;

65

C.      Selling advertised vehicles to consumers for more than the advertised price in violation of Section 475.310;

D.      Failing to make available to the public all vehicles described by its advertisement at the advertised price in violation of Section 475.310;

E.      Negotiating the terms of a sale of a vehicle and thereafter adding the cost of items such as Xzilon and LoJack without previously disclosing same to the consumer and without the consumer's consent in violation of Section 475.580;

F.      Advertising "closed-end credit" terms in the advertisement, offer for sale, or sale of motor vehicles such as the amount of down payment without clearly and conspicuously including required disclosures in violation of Section 475.610; and

G.      Advertising a finance rate without including required disclosures in violation of Section 475.630.

## CONSUMER INJURY

221.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Used Car Rule, the Illinois Consumer Fraud Act, the Illinois Uniform Deceptive Trade Practices Act, the Illinois Prizes and Gifts Act, and the Illinois Motor Vehicle Advertising Regulations. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

222.    Wherefore, Plaintiffs request that the Court:

a. Enter a permanent injunction to prevent future violations of the FTC Act, the Used Car Rule, the Illinois Consumer Fraud Act, the Illinois Uniform Deceptive Trade Practices Act, the Illinois Prizes and Gifts Act, and the Illinois Motor Vehicle Advertising Regulations by Defendants;

b. Grant preliminary injunctive and ancillary relief;

c. Award monetary and other relief within the Court's power to grant;

d. Award Plaintiff State of Illinois civil penalties up to $50,000 per deceptive or unfair act or practice and an additional amount of $50,000 for each act or practice found to have been committed with intent to defraud, as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7;

e. Award Plaintiff State of Illinois an additional civil penalty in the amount of $10,000 per deceptive act or practice found by the Court to have been committed by Defendants against a person 65 years of age or older as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7;

f. Award the costs of bringing this action, including all costs incurred by the Illinois Attorney General for the investigation and prosecution of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

g. Award any additional relief as the Court determines to be just and proper.

Dated:    December 19, 2024

Respectfully submitted,

FOR THE FEDERAL TRADE COMMISSION:

/s/ *James Davis*
_____
James Davis
Rachel F. Sifuentes
Rachel Granetz

Federal Trade Commission
230 South Dearborn Street
Suite 3030
Chicago, Illinois 60604
312.960.5634
jdavis@ftc.gov
rsifuentes@ftc.gov
rgranetz@ftc.gov


FOR THE PEOPLE OF THE STATE OF ILLINOIS:

KWAME RAOUL

Illinois Attorney General

/s/ *Jacob Gilbert*
_____
Jacob Gilbert
Margaret McWhorter
William S. Wingo
Elizabeth Blackston
Christen Lee


Consumer Fraud Bureau
115 S. LaSalle Street
Chicago, Illinois 60603
Jacob.Gilbert@ilag.gov
Margaret.McWhorter@ilag.gov
William.Wingo@ilag.gov
Christen.Lee@ilag.gov